UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| NAUTILUS INS. CO., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| AMERICAN COMMUNITY SERVS., INC., | ) |
| individually and/or d/b/a | ) |
| U-GOLD KEY, INC., PHOENIX | ) |
| IMAGERY, INC., UNIFIED STARS, INC., | ) |
| SUN INS. SERVS., INC., SCIROCCO FIN. | )   2:05-cv-30-AS-CAN |
| GROUP, INC., JOHN A. DAMIANI, JR., | ) |
| JOSEPH W. COLE, II, CARLA B. COLE, | ) |
| KIELE HAMBRICK, DAVID REUTER, | ) |
| individually, and as representative of | ) |
| the Estate of Shirley Reuter, | ) |
| JUSTIN L. CHRETIEN, and | ) |
| UNIFIED PRODUCERS, INC., | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION & ORDER

This matter is before the Court on remand from the United States Court of Appeals for the Seventh Circuit in order to make a choice-of-law determination in an insurance-coverage case involving several door-to-door magazine salespersons who committed violent crimes while on the job. The sales persons were employed by several small corporations ("the shell corporations"), each of which was insured by Nautilus Insurance Company ("Nautilus"), and each of which was associated with American Community Services ("ACS"). After several criminal victims brought suit against ACS and the shell corporations for negligent hiring, the shell corporations sought Nautilus' defense and indemnification

from suit. Nautilus, however, argued that it owed the corporations no duty to defend or indemnify under Indiana law. The shell corporations disagreed, countering that Illinois law should govern the matter.

In its order dated October 11, 2006, this Court held that Indiana law applied to the insurance policies. Nautilus Ins. Co. v. American Cmty. Servs., Inc., 2006 WL 2925658 (N.D. Ind. Oct. 11, 2006). While the majority of this Court's opinion was subsequently affirmed by the Court of Appeals, as to one corporation in particular–Phoenix Imagery, Inc. ("Phoenix Imagery"), whose salesman murdered a New Jersey woman in the course of his door-to-door sales for the company–the Seventh Circuit found a factual dispute concerning the company's principal place of business that bears on the choice-of-law determination in this case.

As the Seventh Circuit pointed out, "The choice-of-law determination is especially important in this case because the substantive law in Indiana and Illinois differs on the point of law at the heart of the underlying lawsuits against the magazine-sale corporations: whether negligent hiring can constitute an 'occurrence' under an insurance policy." Nautilus Ins. Co. v. Reuter, 537 F.3d 733, 735 (7th Cir. 2008). If Phoenix Imagery's principal place of business is Indiana, then Indiana law applies and summary judgment in favor of Nautilus was proper; however, if Phoenix Imagery's principal place of business is Illinois, then Illinois law applies and summary judgment was improper.

As directed, this Court held an evidentiary hearing on the matter in South Bend,

Indiana on April 14, 2009, at which counsel for Nautilus and counsel for David Reuter presented evidence concerning Phoenix Imagery's principal place of business.[1] For the reasons that follow, this Court finds that Phoenix Imagery's principal place of business is Indiana; thus, Indiana law governs the insurance agreement and summary judgment in favor of Nautilus was proper.

## I. FINDINGS OF FACT

It is undisputed that ACS is an Indiana company that was incorporated in Indiana and has its principal place of business in Indiana.[2] According to ACS' Articles of Incorporation, which were filed with the Office of the Secretary of State of Indiana in 1979, ACS' principal place of business is 8557 West Highway 20, Michigan City, Indiana.[3] Further, ACS admitted in discovery that it had no evidence that it did any business in Illinois from 2000 to 2006.[4] Additionally, the Court of Appeals held that with regard to ACS, the law of Indiana controls. Nautilus, 537 F.3d at 733.

However, there remains a dispute as to Phoenix Imagery's principal place of business. In her declaration, the President of Phoenix Imagery, Lynne Harvey ("Harvey" or "Ms. Harvey"), claimed that Phoenix Imagery's principal place of business is Illinois, stating:

---

[1] Despite notice provided at a practicable street address for Phoenix Imagery, Phoenix Imagery did not appear.
[2] Doc. No. 100 at 2.
[3] Doc. No. 120 at Ex. N(1).
[4] Doc. No. 120 at Ex. M.

> Phoenix Imagery was formed in February of 2003. Since the date of its formation, I have been the president of Phoenix Imagery, Inc. Phoenix Imagery, Inc. has been engaged in the sale of magazines subscriptions. Phoenix Imagery, Inc.'s principal place of business from the date of its formation until June 2004 was 26225 South Victoria Lane, Crete, Illinois.[5]

It is now before this Court to weigh the truth and veracity of Ms. Harvey's statements. In support of its position that Illinois was not Phoenix Imagery's principal place of business, Nautilus offered several new pieces of evidence, including depositions of Guy O'Brien and Harvey (taken by counsel for Reuter) in a separate tort litigation case arising out of the same tragic murder that caused the instant coverage dispute. See <u>Reuter v. American Comty, Servs., Inc., et al.</u>, cause No. 3:05-CV-5620 (D.C.N.J.). That evidence, along with the extensive record already before this Court, reveals the following information useful to this Court in determining the truth and veracity of Ms. Harvey's declaration:

A.  Phoenix <u>Imagery's Formation Documents</u>

In their Appellate Brief before the Seventh Circuit, Reuter and Chretien admitted that Phoenix Imagery was formed as an Indiana corporation, created pursuant to the "Indiana Business Corporation Law."[6] In its Certificate of Incorporation filed with the Indiana Secretary of State, Phoenix Imagery lists its principal place of business as being: 1 Marine Drive, Michigan City, Indiana.[7] Phoenix Imagery's Certificate of Incorporation also listed Mr. Michael Bergerson, an attorney licensed in Indiana, as its registered agent. <u>Id</u>.

---

[5] Doc. No. 216 at Ex. 1.
[6] Doc. No. 212 at Ex. 4 at 31. <u>See also</u> Doc. No. 120 at Ex. N(4).
[7] Doc. No. 120 at Ex. N(4). Significantly, the Articles of Incorporation, which were signed by Ms. Harvey, state that Harvey's address is also the Michigan City, Indiana address. <u>Id</u>.

4

However, on an independent contractor agreement between ACS and Phoenix Imagery, Phoenix listed the location of its offices as the address in Crete, Illinois.[8]

B.      The Nature of the Crete, Illinois Address

Guy O'Brien testified that he was a co-owner of ACS from 2000 through 2005 and was also the president of one of ACS's many shell corporations, G.O. Innovators.[9] He also testified that he owned property located at 26225 Victoria Street, Crete, Illinois, which Lynn Harvey identified in her declaration as Phoenix Imagery's principal place of business.[10] However, according to O'Brien's deposition, it was not a place of business, but rather, O'Brien's residence where he lived with his wife and elderly father.[11] O'Brien testified that, although Lynne Harvey used the Victoria Street address as her mailing address, she did not live there. Id. He testified that Lynne Harvey, like many other persons associated with the shell corporations, used it as her home address as a convenience, because they "do a lot of traveling, so it is very convenient for everybody to have that as an address." Id. Indeed, O'Brien testified that so many of the shell corporations' workers used his home address, he could not remember all of their names. Id. O'Brien also testified that due to the travel associated with his business, he used ACS' address in Michigan City, Indiana as the principal address for G.O. Innovators during 2004, the period of the crimes that led to this suit. Id.

---

[8] Doc. No. 216 at Ex. 4.
[9] Doc. No. 212 at Ex. 1.
[10] Doc. No. 216 at Ex. 1.
[11] Doc. No. 212 at Ex. 1.

C. ACS and Phoenix Imagery

As the Seventh Circuit noted, much of the information we have about the relationship between ACS and Phoenix Imagery was established by Phoenix Imagery's own admission:

> By failing to respond to Nautilus's requests for admission, Phoenix Imagery admitted (via Fed. R. Civ. P. 36) to using the mailing address for ACS, in Indiana; obtaining its insurance through its contacts with ACS; allowing ACS to "terminate" its salespersons in the event of complaints of misconduct from customers; accepting advisement from ACS relating to the accounting, record keeping, and management of its business; and allowing its employees to wear ACS identification badges when selling magazines door-to-door.

Reuter, 537 F.3d at 741. Additionally, testimony has revealed the following aspects of ACS' role in Phoenix Imagery's business:

1. The Formation of Phoenix Imagery

In Reuter v. American Comty, Servs., Inc., et al., cause No. 3:05-CV-5620 (D.C.N.J.), Reuter expressly alleged that Phoenix Imagery was "created with the assistance of and for the benefit of American Community Services."[12] Reuter also argued that "Phoenix Imagery [and others] were agents, servants, and/or employees of the defendant, American Community Services, Inc." and were under the "control, actual and assumed" of ACS. Id.

In her deposition, Harvey stated that she started Phoenix Imagery on February 3, 2003 and, in order to start the company, she traveled from her then-residence in Illinois to Michigan City, Indiana.[13] Further, Ms. Harvey testified that she traveled to Indiana several times when starting up Phoenix Imagery in order to gather supplies from what she termed the

---

[12] Doc. No. 212 at Ex. 3.
[13] Doc. No. 212 at Ex. 2.

6

"home office" in Michigan City (which she also identified as the ACS office) and in order to do Phoenix Imagery's banking, all of which was conducted in Michigan City. Id.

2. Insurance Policies

Harvey testified that ACS assisted Phoenix in purchasing insurance, and that she never personally obtained insurance on behalf of Phoenix Imagery.[14] She said that she was free to purchase insurance for the corporation from anyone else, but she never did. Id. Indeed, in their Seventh Circuit brief, Reuter and Chretien admitted that ACS "managed" the insurance policies of its subsidiaries.[15]

In evidence previously offered to this Court in support of Plaintiff's Motion for Summary Judgment, ACS's office manager, Tina Green, who worked in ACS' Michigan City, Indiana office, testified that ACS routinely purchased insurance for all of the shell corporations with whom ACS did business.[16] She further testified that ACS even filled out the paperwork on behalf of the shell companies. Id.

Phoenix Imagery's insurance application lists Phoenix's mailing address as the Crete, Illinois address.[17] Further, Illinois law was followed with regard to filing the insurance policy and filling out a "surplus line risk affidavit."[18] Yet, Phoenix's application for the insurance policy, like the applications of all the shell companies, lists ACS' President, LeVan

---

[14] Doc. No. 212 at Ex. 2.
[15] Doc. No. 212 at Ex. 4.
[16] Doc. No. 53 at Ex. B.
[17] Doc. No. 216 at Ex. 2.
[18] Doc. No. 216 at Ex. 3.

7

Ellis, as the contact person for inspecting the insured premises.[19] The applications all list the shells' contact numbers as 219-879-4674. Id. This is the telephone number of ACS' office in Indiana.[20]

Finally, the evidence presented by Nautilus makes plain that the policies were actually delivered to Michael Bergerson, attorney for ACS in Indiana.[21]

3. Procurement of Supplies

Guy O'Brien also testified that ACS supplied (for a fee) the documents that Phoenix and the other shell corporations used to conduct their sales, including: the books used to conduct their sales, the suitcases in which the sales literature and samples were carried, the receipts, the employment contracts, in sum, "all the sales documents that sales persons needed."[22]

In addition, Harvey testified that ACS co-signed for the vans used by the subsidiary that Harvey operated before she started Phoenix Imagery.[23] Similarly, O'Brien testified that ACS co-signed for the vans used by the subsidiaries that he owned, and provided interest-free advancements to the subsidiaries, to be repaid out of future commissions.[24]

---

[19] Doc. No. 120 at Ex. O(1)-O(6).
[20] Doc. No. 120 at Ex. S(2).
[21] Doc. No. 120 at Ex. P; Ex. Q.
[22] Doc. No. 212 at Ex. 1.
[23] Doc. No. 212 at Ex. 2.
[24] Doc. No. 212 at Ex. 1.

4. Overlapping Contact Information

On its 2003 tax returns, Phoenix Imagery reported to the Internal Revenue Service that its address was 8557 West U.S. Highway 20, Michigan City, Indiana,[25] ACS's Indiana address.[26]

Additionally, Harvey testified that if Phoenix Imagery customers had complaints about services rendered by Phoenix Imagery, they would generally call ACS in Indiana.[27] Furthermore, Harvey stated that receipts for sales made by Phoenix Imagery personnel showed ACS's Indiana telephone number, rather than any Illinois contact information. Id. Similarly, in his deposition, O'Brien testified that the shell corporations issued receipts to customers that set out ACS as the business with whom the customers were trading, rather than the names of the shells.[28] Indeed, one of the reasons that Shirley Reuter's murderer was apprehended was because he accidentally left behind an ACS receipt in her home after murdering her.[29]

Additionally, in the National Field Selling Association's directory, numerous shells gave as their telephone number (219) 874-7248, an Indiana telephone number belonging to ACS.[30] In particular, Phoenix Imagery listed its telephone number as (219) 879-4674, another Indiana telephone number belonging to ACS. Id.

---

[25] Doc. No. 120 at Ex. S(1).
[26] Doc. No. 120 at Ex. N(1).
[27] Doc. No. 212 at Ex. 2.
[28] Doc. No. 212 at Ex. 1.
[29] Doc. No. 212 at Ex. 2.
[30] Doc. No. 120 at Ex. S(2); Doc. No. 120 at Ex. S(3).

5. Overlapping Management

In her deposition, Harvey stated that while O'Brien was a co-owner of ACS, he was also the "senior manager" of Phoenix Imagery, a position that involved O'Brien assuming responsibility for all of Harvey's debts incurred in the context of Phoenix Imagery.[31] If Harvey left the corporation, Guy O'Brien would pay her debts. Id.

O'Brien also testified that he was the "senior manager" of Phoenix Imagery while he was co-owner of ACS, and simultaneously served as the president of one of Phoenix's purported competitors, G.O. Innovators.[32] He also testified that as Phoenix's "senior manager" he was paid a commission based upon Phoenix Imagery's sales, even though he had no "direct involvement" in the company. Id. He testified that this type of overlap was common practice within the ACS organization, where a senior manager (such as himself or prior ACS co-owner Don Scott) would often assist in the establishment of subsidiary corporations by walking the person through the initial stages of business development and then "present[ing] these people to [ACS] and say[ing] 'This person's ready.'" Id. ACS would bring in a new subsidiary, and ACS would pay the "senior manager" (who was, at least in the case of Phoenix Imagery, an ACS co-owner) a commission based on the subsidiary's earnings.[33] As owner of Phoenix Imagery, Harvey testified that she never saw the accounting for the commissions taken out of Phoenix's sales and did not know how much

---

[31] Doc. No. 212 at Ex. 2.
[32] Doc. No. 212 at Ex. 1.
[33] Id.; Doc. No. 212 at Ex. 2.

10

the commission was.[34] She testified that she was not "privy to the information" because ACS kept the books regarding her sales and disbursements from her sales. Id.

    6.    Recruitment

Harvey testified that she and another woman based in Illinois did all of Phoenix Imagery's recruitment. Id. Further, O'Brien testified that each week, the shell corporations would send their sales totals and the names of their new hires to ACS in Michigan City, Indiana; ACS then compiled them into a newsletter called the "Crew News," which was, in turn, distributed to each shell corporation.[35]

Also according to O'Brien, salespersons for ACS, Phoenix Imagery, and the other shell corporations were hired pursuant to a contract called "Terms of Enrollment," which ACS required the shell corporations to have their employees sign and return to ACS. Id. ACS would then have background checks run on the employee before they could work for Phoenix Imagery or the other shell corporations. Id. Similarly, Harvey confirmed that Phoenix Imagery conducted no background checks on its own sales personnel.[36] Instead, ACS handled all background checks through a company based in Illinois. Id. Harvey also testified that ACS would not process sales from Phoenix Imagery until ACS had received the Terms of Enrollment. Id.

---

[34] Doc. No. 212 at Ex. 2.
[35] Doc. No. 212 at Ex. 1.
[36] Doc. No. 212 at Ex. 2.

11

D.  <u>Details of the Murder which have a Bearing upon Phoenix Imagery's Principal Place of Business</u>

Both Harvey and O'Brien testified to the events that led to the tragic murder that caused the current coverage dispute.

Harvey testified that she hired the eventual murderer, Azriel Bridge, after having a series of telephone conversations with him. <u>Id</u>. Bridge was referred to Harvey by word of mouth and lived somewhere in or around Chicago, Illinois. <u>Id</u>.

On the day before the murder, ACS personnel notified Harvey that Bridge had not signed his "Terms of Enrollment." <u>Id</u>. Though ACS had received magazine orders from him in the field, they had no record of Bridge's Terms of Enrollment in their files. <u>Id</u>.

O'Brien testified that in the days leading up to the murder, he, his crew (working for G.O. Innovators), and Harvey's crew, including Bridge (working for Phoenix Imagery), along with employees from two of the other shell corporations, traveled to New Jersey to sell magazines.[37] O'Brien testified that Harvey, for personal reasons, did not travel to New Jersey with the rest of the group. <u>Id</u>. The crews were not separated into vans according to their various employers; instead, O'Brien testified that "It was a personal election on each person. You know, 'I'm riding with my friend that's in this van.' . . . There was no designation who rides what. You know, it's not that kind of situation." <u>Id</u>. The group then gathered together in the same hotel in New Jersey, with room assignments decided based upon "Compatibility, prior rooming situations." <u>Id</u>. Bridge, a Phoenix Imagery employee,

---

[37] Doc. No. 212 at Ex. 1.

was staying in a room with employees from another shell corporation, G.O. Innovators. Id. O'Brien further explained that he gathered together the crews of all of the shell corporations, and they spilt up into various groups to sell, with O'Brien in charge of the whole operation. Id. O'Brien testified that because Bridge was a new hand, O'Brien assigned a trainer for him. Id.

Additionally, O'Brien testified that he made money as co-owner of ACS, as owner of G.O. Innovators, as senior manager of Phoenix Imagery and of the two other shell corporations involved in the New Jersey sales trip. Id. He also stated that he was in charge of all of the individuals on the sales trip, though there were also "field supervisors" serving under O'Brien and directly supervising the salespersons. Id. O'Brien admitted that the field supervisors would be paid on a commission based upon the amount the car of salespersons sold during the day, although those salespersons may or may not be employed by the same shell corporation as the field supervisor. Id.

O'Brien further testified that before each morning of travel, he held a morning meeting for all the salespersons and field supervisors, after which each van would leave the hotel to make sales. Id. O'Brien, meanwhile, stayed behind to take care of "business interest[s], conversations; [his] own personal stuff," and to "get ready for the evening." Id. Then, at the end of the day O'Brien would meet with the field supervisors to give advice or talk about different situations that might have arisen throughout the day. Id.

13

On the evening after the murder had occurred, but before O'Brien or anyone else knew about it, Bridge's field supervisor, David Ross, who worked for G.O. Innovators, reported that Bridge had brought in a check that looked like it was forged. Id. It turned out that the check was stolen from Mrs. Reuter after Bridge murdered her. Id.

The day after the murder, O'Brien testified that, while still in New Jersey leading the team, he was contacted by the President of ACS, LeVan Ellis, who first informed him of the possibility that a murder had occurred. Id. Later, after Bridge was apprehended by police, O'Brien testified that he notified Harvey of the murder. Id.

Similarly, Harvey testified that on the day of Bridge's arrest, the first person who informed her that one of her employees had committed a murder was ACS co-owner O'Brien.[38] She testified that no law enforcement officers ever attempted to contact her, despite her position as Bridge's employer. Id. Instead, police questioned O'Brien, who testified that if the police wanted to talk to someone about G.O. Innovators or Phoenix Imagery, the appropriate person would be him.[39]

---

[38] Doc. No. 212 at Ex. 2. The questioning in her deposition on the matter is as follows:
> Q. Okay, alright. When everything settled down at the hotel, who was the first one that called you and said there was a murder investigation and Mr. Bridge was a suspect?
> A. Guy called me.
> Q. Okay. Tell me about the substance of that conversation.
> A. He called me. He said, 'we have a big problem. I don't know if it is true, but I need to inform you on what's going on. Police are here. I need to find out what is going on because I have no clue.'

Id.

[39] Doc. No. 212 at Ex. 1.

14

Harvey went on to state that after the murder, Ellis, the president of ACS, called her to discuss the situation.[40] She testified that at the time of the phone call, she was "very concerned" about continuing her relationship with ACS, in part because she had never before "cleared orders" though any organization other than ACS. Id. Less than a week later, Ms. Harvey got a letter from ACS withdrawing Phoenix Imagery's "authority to sell." Id. After she received the letter, she called O'Brien, who confirmed that ACS was withdrawing Phoenix Imagery's authority to sell due to the fact that Bridge's Terms of Enrollment were not in ACS' possession at the time of the murder. Id.

When Harvey was asked if ACS took any action against any other Phoenix Imagery employees, she answered: "I haven't the slightest idea what they did with anyone else; at that point, my concern was myself." Id.

O'Brien testified that after the murder he "choose not to do business" with Phoenix Imagery and Harvey's crew.[41] However, he testified that numerous individuals who were Phoenix Imagery salespeople subsequently worked for G.O. Consultants, a company he started while he was an ACS co-owner and owned ACS shell corporation, G.O. Innovators. Id. He further testified that former Phoenix Imagery employees continued selling magazines following the murder with money accruing to himself and to ACS. Id.

## II. Conclusions of Law

The selection of one state's substantive law over another in the event of a conflict

---

[40] Doc. No. 212 at Ex. 2.
[41] Doc. No. 212 at Ex. 1.

presents a question of law that is decided by the court. Gramercy Mills, Inc. v. Wolens, 63 F.3d 569, 571 (7th Cir. 1995). This Court, sitting in diversity, uses Indiana choice-of-law principles to determine which state's substantive law governs the proceeding. See Malone v. Corrections Corp. of America, 553 F.3d 540, 542 (7th Cir. 2009) ("In diversity litigation it is a familiar principle that federal courts use the whole law of the forum state, including that state's choice-of-law rules.") (citing Guaranty Trust Co. v. York, 326 U.S. 99 (1945)).

"Indiana's choice of law rule for contract actions calls for applying the law of the forum with the most intimate contacts to the facts." Employers Ins. of Wausau v. Recticel Foam Corp., 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999). This approach is embodied in the Restatement (Second) of Conflicts, which states, in relevant part:

> [T]he contacts to be taken into account . . . to determine the law applicable to an issue include:
>     (a) the place of contracting,
>     (b) the place of negotiation of the contract,
>     (c) the place of performance,
>     (d) the location of the subject matter of the contract, and
>     (e) the domicil, (sic) residence, nationality, place of incorporation and place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflicts § 188 (1971). Here, the Seventh Circuit noted that the first four factors of the Restatement test are not determinative, and the determination of the choice-of-law turns on the fifth element–the parties' place of business. Nautilus, 537 F.3d at 733-37.

The evidence and testimony presented at the evidentiary hearing, detailed *supra*, make

it plain that, notwithstanding Lynne Harvey's affidavit, the address on the insurance policy, and the independent contractor agreement to which the Seventh Circuit referred, the overwhelming weight of the evidence and testimony indicates that Phoenix Imagery's principal place of business was Indiana.

Phoenix Imagery was incorporated in Indiana, and Harvey, Phoenix Imagery's founder, traveled to Indiana in order to start the company. Though she used the Crete, Illinois address to receive mail, counsel for Reuter admitted that this address "simply serves as a place to receive messages and Phoenix Imagery really needs no physical office." (Docket No. 214 at 5). Thus, it is undisputed that Phoenix Imagery did not depend upon the Illinois address in order to carry out its business. The same cannot be said for Phoenix Imagery's ongoing and pervasive connection to ACS, based in Northwest Indiana.

Specifically, ACS procured and managed the insurance policy for Phoenix Imagery. That policy, for which ACS' President was the inspection contact, listed ACS' Indiana-based phone number rather than any Illinois number or other number connected to Harvey. In addition, the following is true: (1) ACS co-signed on Phoenix's automobiles and provided supplies to Phoenix; (2) persons attempting to reach Phoenix Imagery would often reach ACS because contact information for the latter company was used for the former on tax documents, in trade directories, and even on receipts issued to Phoenix Imagery's customers; (3) the two companies had a significant overlap in management, with O'Brien (an ACS co-owner) serving as "senior manager" of Phoenix Imagery, and leading Phoenix Imagery's

sales team the week that the murder occurred; (4) ACS handled Phoenix Imagery's bookkeeping and paid commissions to the appropriate persons within the ACS organization; (5) although Harvey did Phoenix Imagery's hiring, she was required to submit "Terms of Enrollment" to ACS for each employee and ACS would then have background checks conducted; (6) Phoenix Imagery employees traveled with employees of other ACS shell corporations, with little, if any, formal separation among the employees of the different corporations; and (7) after the murder, ACS withdrew Phoenix Imagery's "authority to sell" and most Phoenix Imagery employees were absorbed into other ACS shell corporations.

Counsel for Reuter suggests that the relationship between ACS and Phoenix Imagery is sufficient to perhaps establish an agency relationship between the two companies, nothing more. (Docket No. 214 at 8). This Court disagrees. Phoenix Imagery's dependance on ACS for its daily functioning shows that ACS' headquarters in Indiana, and not O'Brien's home in Crete, Illinois, was Phoenix Imagery's principal place of business. Thus, notwithstanding Harvey's declaration, this Court finds that Phoenix Imagery's principal place of business is Indiana.

Counsel for Reuter asks this Court to assume that the Court of Appeals did not consider the effect of Auto-Owners Ins. Co. v. Harvey, 842 N.E. 2d 1279 (Ind. 2006) and Tri-Etch, Inc. v. Cincinnati Ins. Co., 891 N.E.2d 563 (Ind. Ct. App. 2008) in rendering its opinion in Nautilus, 537 F.3d 733. In fact, said cases were decided prior to the remand ordered by the Seventh Circuit in this case. Id. This Court is not the appropriate forum for

appealing a decision of the Seventh Circuit Court of Appeals. Moreover, the Seventh Circuit held that "the district court correctly interpreted Indiana law to preclude coverage under the CGL insurance policies for claims of negligent hiring." Nautilus, 537 F.3d at 742 (citing Erie Ins. Co. v. Am. Painting Co., 678 N.E.2d 844, 846 (Ind. Ct. App. 1997)). As such, summary judgment was proper in favor of G.O. Innovators and Unified Stars. Id. This Court was then charged with the duty to hold an evidentiary hearing and determine whether Phoenix Imagery was a legitimate corporation operating out of Illinois, or whether Phoenix Imagery's principal place of business was, in fact, Indiana. Here, having determined that Phoenix Imagery's principal place of business was Indiana, this Court's choice-of-law analysis is complete. Accordingly, Indiana law applies to the coverage dispute and summary judgment in favor of Nautilus was proper.

**SO ORDERED**.

**DATED: May 22, 2009**

/s/ ALLEN SHARP
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**